Our fifth case for this morning, by a minute, is United States v. James Atwood. Ms. Jacobs. Good morning, Your Honors. Michelle Jacobs for the defendant, James Atwood. The government has conceded the appearance of unfairness or impropriety has been established under the recusal statute 455 that Judge Bruce should have recused himself. The dispute here, obviously, is one of remedy. Given the years-long pattern of misconduct and the risks of injustice to Mr. Atwood in other cases, and certainly the risk that denying relief could undermine public confidence in the judicial process, this court should vacate the sentence and remand for resentencing. But don't we need to look at ways in which Mr. Atwood's case came before Judge Bruce, other than, obviously, his sentencing, but in the record of inappropriate e-mails and contacts and all the rest of that, there's very little. I mean, I think a scheduling matter and maybe something else, but when we're just dealing with appearance of impropriety, and I don't think anybody is saying that there was any showing of actual bias on the part of Judge Bruce here, we're in a situation where we need to evaluate harmless error, right? Right. And so why isn't a scheduling matter here and another brief thing there so inconsequential in the absence of any other evidence, such as we've sometimes seen in sentencing transcripts, you know, occasionally we will overturn a sentence because the judge seems to have just gone off the reservation, but not here. I think what's important here is that we remember that this is not an allegation of bias or the appearance of bias against Mr. Atwood. Instead, it is an allegation of at least apparent bias in favor of the United States. And the United States was the party that Mr. Atwood was litigating against. And that's really, I think sometimes we lose focus here. Most of the cases that have been cited in the briefs are cases where the appearance seems to be a problem that a judge may have or could have with a particular defendant. You know, there's the Greenspan case. The Figueroa, yeah. Right. I mean, any of these cases. That really is the typical scenario. But in this instance, you have three years of problematic ex parte contacts, not necessarily, again, in Mr. Atwood's case specifically, but that show such. Well, then it's odd to be assessing prejudice, right? You're saying that the harm in an appearance case is really not necessarily suffered by the individual defendant because there's an absence of an appearance of bias toward that defendant, that the harm is the public's harm that we have to remedy. In part, yes. But I think there's also a risk of prejudice against Mr. Atwood. I'm not conceding. So your theory, I'm just going to try to phrase your theory as sympathetically as I can. It seems to me that your theory is that all of this record that wound up being summarized in this special committee's report, which was made public, shows such coziness with the U.S. Attorney's Office that the presumption was that Judge Bruce was going to rule in favor of the government no matter what was going on. Well, it certainly gives that appearance. I'm not saying, again, as you started out, is there actual bias here? Yeah, it's hard for me to see. What's your best argument in favor of prejudice from an alleged propensity to rule in favor of the government? Well, I would say when we look at all three. He is made a career offender, and obviously you have a separate challenge to that. Right. I mean, as to all three factors that the court is supposed to look at, I think all of them are established here. I think probably the best case of the risk of injustice to Mr. Atwood is the fact that this was in the sentencing context. Sentencing is a highly discretionary, highly subjective proceeding. And in my view, at least, probably the most important thing a district court judge oftentimes has to do. It's a difficult thing. And in a case like this, where Mr. Atwood is looking at now serving 210 months in prison, there is no way for us to know the extent of the impact that this relationship, as you said, sort of this cozy relationship with the United States Attorney's Office. What kind of relationship? What would you say if he never had stuff become public? You knew he was that long with the U.S. Attorney's Office. How many years? 23, 24. It was a long time. He was there a long time, I know. Do you practice in that area, where this came from? Do I practice in the Central District of Illinois? Yeah. I want to know about how many times you've appeared before Judge Bruce. I have never appeared before him. All right. No, you took the appointment from this court, and you're from Wisconsin. I did. That's right. That's right. But just saying, okay, I'm appearing before a district judge who spent 20 years in the U.S. Attorney's Office, how would you feel about that without the other information? In my own career, I've done that a lot. Two of the district judges in the Eastern District of Wisconsin are former United States attorneys or assistant United States attorneys, and I've appeared in front of both of them many, many times. But I know I was talking about your concern, but maybe you don't have a concern. Why is it so different here? Sure. I think we all recognize, and the courts have recognized, that there are going to be personal relationships between people who are judges and litigants, not litigants, but the lawyers that appear in front of them. But this was at such a different circumstance, given that what we see in all of the emails are things like Judge Bruce cheering on the United States Attorney's Office, for lack of a better way to summarize it, discussing trials, discussing cases. At times, I think he comes close to giving legal advice. Those kinds of things. And it's not a – it's not a – For which he was publicly reprimanded by the Judicial Council. For which he was absolutely publicly – absolutely, absolutely. And it wasn't just a single episode or in a single case. I understand. Suppose you deal with law clerks who clerk for a particular judge. Does that give you any concern that they're on the other side? A law clerk representing a defendant? A former law clerk of the court? I think there is some sort of cooling-off period before that should happen, as I understand it. I don't know the specifics of that. Most judges – the Supreme Court uses a two-year period, and I think most judges take that as guidance. I use one. Right. Counsel, is it your position, then, that at least in those cases that are not time-barred, that every sentencing or criminal trial or plea that was entered in front of Judge Bruce should be vacated and remanded to a different judge? Well, I'm not here to make that argument on behalf of each and – But we have to think about that, right? You do. You absolutely do. And I would say that really is one of the factors that you have to consider under Lilzerberg, or however you say that case name. The risk of denying relief creates injustice in other cases is one of those factors. So I do think you have to think about it. I think you may be in a position to provide some sort of roadmap for how that would play out in other cases. You know, is it something where other litigants could have an opportunity to raise this issue? Are they going to need to raise it in a 2255 if they haven't already and the case is completed? I mean, I don't know, but I know for Mr. Atwood, having been sentenced to 210 months in prison on 70 grams of cocaine in front of a judge that appears to have a real affinity for the United States Attorney's Office, the risk of injustice to him is really significant. Can that affinity ever wear out? Can that affinity ever wear out? Well, I think that's why the Judicial Council continued to keep him off of criminal cases for some period of time. And I think in the Special Committee's report, it says, as a way to allow that sort of taint to dissipate, I think I'm sure that Judge Bruce at this point has sort of learned his lesson or understands going forward what kinds of relationships are appropriate to have with his former colleagues and what kinds of communications and relationships are not okay. And then I guess just a couple of... Did you want to quickly say anything about your other points? You're about to run out of time, but... I am. I guess what I would say is to the extent that... You can extend on your brief if you want. I think I will, and I guess what I would say is to the extent that this Court believes that a remand for resentencing is appropriate, the career offender issues that we've raised I think are probably best addressed by the District Court anyway. I think there's at least one arguable sort of factual dispute in that set of issues that I think probably would be best handled in the first instance by the District Court. And as to the sentence on count three, that I think has to go back. The government has conceded it's in excess of the statutory maximum. So I guess my view would be if there's going to be a remand, and I hope there is on the recusal issue, that that career offender issue is best first addressed with the District Court. Okay. Thank you. Thank you. Mr. Walters. Mr. Walters, is this case now assigned to Judge Myerscough for whatever else needs to be done to it? It is, Your Honor. It was assigned when we had a little bit of motion practice before the Court during the pendency of this appeal, collateral matters, not jurisdictional matters. And so I believe that Judge Myerscough was the judge that handled those matters. So if there were anything else, it would go back to Judge Myerscough, even though Judge Bruce is hearing things again. I believe so, although my understanding is some matters are being reassigned to Judge Mim, who's on senior status. But I think the presumption is that Judge Myerscough would sit. To make sure, then we could in any order say it should be resolved by a different judge. Well, we would certainly agree that if you remanded it, that would not go back to the same judge by whom we confessed that there was an appearance of bias. So yes, Your Honor. So, I mean, it goes without saying, but I will say that ex parte communications run the risk, the real risk of undermining confidence in judicial decisions. I don't stand here as an apologist for the United States or for Judge Bruce. We have confessed that there is, based on the breadth, approximately 100 ex parte communications, the length of time, the number of cases. So given the discretionary nature of sentencing, why did that appearance of bias not harm? Well, I think we look at the three Liljeburg factors. And looking at the risk of harm first to Mr. Williams, it's interesting. It's hard to stay away from the fact that there was a finding of no actual bias by the judicial counsel, at least no evidence that affected any decisions. But I understand that we are here because of appearance, which is a different issue. Well, and that would mean that you could never show, if you had to have actual bias, that would mean that you could never get relief on an appearance claim. That's not the law. I agree, and I think that's why Liljeburg didn't use a strict harmless error standard but came up with a standard of some type of harmless error analysis. But it's still relevant, I believe, that there was that finding after a deliberative process by the judicial counsel. That, in turn, in our view, increases or takes care of at least two of the Liljeburg factors in the sense that there is a restoration of public confidence when, after an investigation, the counsel comes out and says there is no evidence that this impacted his decision-making in any case. And then when we look at even the potential of appearance of injustice to Mr. Williams as Judge Wood. Mr. Atwood. I'm sorry. Have you had more than one of these arguments? I have another brief that I'm working on that raises the same issue. Mr. Atwood, the risk of injustice is attenuated when we look at it in context. I think it's important, as Judge Wood brought up in the beginning, that with respect to his case, there was the scheduling email regarding an initial appearance, which, by the way, the public defender was copied on. It just wasn't private counsel. And then, secondly, we have a writ for another defendant, Mr. Dorsey, and there was two emails concerning that. And so there is a need to look at attenuation and seeing, well, is there a risk of apparent injustice to Mr. Atwood? Then when we add to that the ability of this court to review the legal questions that he's raised on appeal. But, of course, as Ms. Jacobs points out, even if we were to think it's a matter of law, going through all of this never-ending series of things as what can be predicates to be a career offender and so on, you still have a guidelines range at 188 to 235. You still have the possibility, I believe, although correct me if I'm wrong, of going below the guidelines range. I don't think any mandatory minimum was pushing you at 188. So there's a lot of discretion there. And the judge even goes out of his way in this case. In this case, it may not even be so helpful to say, I'm just giving the sentence that I want to give. I don't care what guidance I'm getting from the guidelines or anything else. I like this sentence. Well, that underscores the discretion, doesn't it? There's no dispute that sentencing is the greatest discretionary function, I think, that any district judge has. So if the judge is perceived by people to lean in favor of the United States, the United States doesn't want that. We don't want that. Nobody wants that. That's not the way we hold ourselves out to be an excellent judicial system in the world. So when somebody can't have that confidence, can't we just give him a resentencing? Certainly. I mean, the court's discretion is broad in fashion and remedy. And, yes, you can give him a resentencing. And really, I think, to be very frank with the court, the issuance of the judicial counsel's order, we believed in good faith afforded us to make arguments concerning the public's confidence. When you have a counsel of this court come out and say there is no evidence of an inappropriate relationship, there is no evidence that it affected his decision-making in any case, we believe that that goes long towards establishing that confidence. Also, the public perception plays a part in this, even though you and other judges and other women in your office don't feel any different. But it's the public perception we're approaching. I mean, the public perception is what underlies 455A, I think, more than anything. And certainly, a lit against perception is equally important. But in light of Preston over time, when at one time you couldn't even raise a 455A issue in this court unless by mandamus, and then in Fowler against Butts, it made it clear that, look, there's importance of vindicating the public's interest in being able to raise this on direct appeal and not having to bring a mandamus action. So, yes, Judge Keeney, to answer your question, public perception. Is there any minimum in this sentence? No, there's not. It was an 841B1C sentencing range, so zero to 30 months if you agree with the government on the sentencing issue. So you said you were working on one other brief involving an appeal presenting the same issue in Mr. Williams' case, apparently. Do you have many in the hopper? I have two. This one on argument and then Mr. Williams' case, my brief is due on Monday. So, no. So do we know how you'll be spending the weekend? I have it drafted. If I could address outside the context of this case, Judge Barrett, you asked about should we be vacating all cases. I think we didn't cite it in our brief because the issue didn't come up, but in United States v. Troxell was a decision this court remarked, and it was a number of years ago and I don't have the site, but that relief has never been afforded post-judgment, as in post-appeal. Post-direct appeal, you mean. Based on a 455A appearance, and appearance is important. It's not a structural error. I've researched. I haven't found a single 2255 case in which relief was granted based on an alleged appearance of impropriety. So this would just be a direct appeal pipeline we're talking about? Yes. No 2255s? That would be our view, and I'm sure my next counsel who's arguing would have a different view, Mr. Patton. So that's our answer, is that we're looking either under Rule 33, actual bias as a structural error, or under 2255 with basically the same argument, concerning that it would have to be actual bias instead of an appearance of bias. Unless the court has any other questions on the bias issue, I would just like to briefly address understanding perhaps the tenor of the panel right now, but still that... I'd be very interested in, actually I got all interested in the isomers, which do seem to be different substances. It seemed like the government in the final analysis said we just can't find any case in which there was a prosecution under this third type of isomer. Well... The thing that would make the Illinois law broader. In theory, yes, it's different. I mean, it's definitely different structurally, too. Well, yes, but look, to be very frank without being hyperbolic, it's somewhat akin in our view to being the leprechaun of cocaine, that it really doesn't exist, at least in the illegal drug trade. That what you have is, we believe, a state that overreacted in adding every possible isomer, but it would be... It's just, it's perhaps overbroad on its face, but in reality when you look at the fact that a constitutional isomer or a positional isomer, when bonds are broken, that it may have the same molecules, the same elements, but it's ultimately, or excuse me, the same elements and atoms, but when bonds are broken, it can give it a whole different effect on an individual to the point that it could be the functional equivalent of Kool-Aid instead of cocaine. Now, that's not in the record, but that's what our argument would be, and certainly this positional isomer argument or other types of isomers... Isn't the geometrics? I'm trying to remember which one isn't. The positional isomers are not included in the federal definition. So those are kind of the structural isomers. Yeah, I'm out of time, so... Yeah, no, that's all right. I just... If you want to wrap up about your sentencing argument, that's fine. Again, we confess the appearance. Oh, wrap up on the sentencing argument. All right. I apologize. We don't believe they exist in the illegal drug trade, and if they really did exist, we believe that the federal government would have included that in its definition as well, and so that's where we stand on the issue. Okay, thank you. Thank you very much. Ms. Jacobs, anything further? I'm just going to touch on that positional isomer issue, and I think given what the government's view is that these things don't exist, number one, there's nothing in the record like that, and number two, I think it is important, this sort of realistic probability of whether there would be a prosecution argument that the government makes to try to rebut that positional isomer issue, that test does not apply when a state statute on its face is clear and the Illinois definition of cocaine seems to me to be very clear. Oh, it lists all three of them. There's no doubt about that. Right. Does it matter that the guidelines don't seem to be worried about what kind of isomer is? I recall it's the Controlled Substances Act, right? That's right. Basically, that's the government's one of the other government arguments is that we shouldn't incorporate the Controlled Substances Act into the 4B1.1 definitions as a way to sort of get around this. But, again, the majority of circuits have held clearly that that incorporation should happen. That creates a problem because this is plain error review, right, the fact that we didn't have controlling precedent on whether the Controlled Substances Act definition applies. I don't think it's a problem in this case if the court decides that plain error applies because of the significance of the swing in sentence for Mr. Atwood. His guideline range was 188 to 235 months. Had he not been a career offender, if we're right about this, his guideline range would be 24 to 30 months. Tenfold. Right. Not quite, but anyway. Okay, thank you very much. Thanks to both counsel. And thank you so much for taking the appointment. It's a great help to the court.